1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
8    WESTERN DISTRICT OF WASHINGTON
     AT SEATTLE
9

10   KING COUNTY, WASHINGTON,              CASE # 2:10-cv-01156-RSM

11                  Plaintiff,             ORDER GRANTING IN PART AND
                                           DENYING IN PART DEFENDANTS'
12         v.                              MOTION TO DISMISS FIRST
                                           AMENDED COMPLAINT
13   MERRILL LYNCH & CO., INC., a
     Delaware corporation; MERRILL
14   LYNCH MONEY MARKETS, INC., a
     Delaware corporation; MERRILL
15   LYNCH, PIERCE, FENNER AND
     SMITH, INC., a Delaware corporation;
16   and DOES 1-100,

17                  Defendants.

18

19                        **I. INTRODUCTION**

20         This matter comes before the Court upon Defendants' (collectively referred to as "Merrill

21   Lynch") motion to dismiss Plaintiff King County's First Amended Complaint ("FAC") under

22   Federal Rule of Civil Procedure 12(b)(6).  Dkt. # 79.  For the following reasons, Merrill Lynch's

23   motion is GRANTED IN PART and DENIED IN PART.

24

# II. BACKGROUND

The Court recounts the facts as alleged by King County, assuming them to be true without expressing belief in their accuracy.

## A. Merrill Lynch becomes a securities dealer for King County

King County is a political subdivision of Washington State. FAC ¶ 15. It is also an institutional investor, controlling a multi-billion dollar investment fund on behalf of itself and over 100 public entities. *Id.* ¶ 26. King County has adopted investment policies emphasizing prudence. *Id.* ¶¶ 28-30.

The investment policies also govern the hiring of securities dealers. FAC ¶ 32. King County requires applicants seeking to become securities dealers to fill out a "Dealer Questionnaire" that asks various questions about the applicant's finances, experience, and policies. *See* Dkt. # 70, Ex. 1 at 1-3. The Dealer Questionnaire also contains a Dealer Certification, which reads:

> I hereby certify that I have personally read the investment policies and objectives of King County and have implemented reasonable procedures and a system of controls designed to preclude imprudent investment activities arising out of transactions conducted between our firm and King County. All sales personnel assigned to your account will be routinely informed of your investment objectives, horizon, outlook, strategies and risk constraints whenever we are so advised. We will notify you immediately by telephone and in writing in the event of a material adverse change in our financial condition. We pledge to exercise due diligence in informing you of all foreseeable risks associated with financial transactions conducted with our firm. I attest to the accuracy of our responses to your questionnaire.

Dkt. # 70, Ex. 1 at 5.

Merrill Lynch is a global financial services firm. FAC ¶ 16. In 1988, a Merrill Lynch account executive named Raymond Thibodeau filled out the Dealer Questionnaire on behalf of Merrill Lynch and signed the Dealer Certification. Dkt. # 70, Ex. 1 at 5. King County approved

1  Merrill Lynch as a securities dealer in 1990, and Merrill Lynch sold securities to King County

2  until 2011.  FAC ¶ 43.

3  **B.  Merrill Lynch responds to problems in subprime mortgage-backed securities**

4          In the mid 2000s, Merrill Lynch was a major player in the field of mortgage

5  securitization.  FAC ¶ 67.  Merrill Lynch bundled mortgage loans into various securities

6  instruments and traded several billion dollars' worth of these products annually.  *Id.* ¶¶ 64, 66.  It

7  also owned a large amount of these securities.  *Id.* ¶¶ 68-69.  At first, Merrill Lynch could limit

8  its exposure to the risk of these securities defaulting.  *Id.* ¶ 69.  For various reasons, however, its

9  exposure to the risk of default grew dramatically throughout 2006.  *Id.*

10         By early 2007, the subprime mortgage industry had begun its now-famous decline.  FAC

11 ¶ 74.  The market collapse started with lenders and quickly spread to mortgage-backed securities

12 of the type Merrill Lynch owned and traded.  *Id.* at 74-76.  In the face of this growing problem,

13 Merrill Lynch developed a plan to offload some of its subprime mortgage-backed securities.  A

14 March 2007 email chain between several Merrill Lynch officers discusses selling various pieces

15 of Merrill Lynch's subprime mortgage-backed securities to structured investment vehicles that

16 sold commercial paper to investors.  Dkt. # 70, Ex. 8.  In turn, Merrill Lynch would market the

17 debt with which the structured investment vehicles funded themselves.  *Id.*; FAC ¶ 81.

18 **C.  Merrill Lynch sells Mainsail commercial paper to King County**

19         This lawsuit concerns three purchases of structured investment vehicle debt known as

20 asset-backed commercial paper.  Asset-backed commercial paper is a short-term money market

21 investment.  FAC ¶ 95.  The safety of such commercial paper depends largely on two factors:

22 (1) the ability of sellers to "roll," *i.e.*, sell new paper to pay maturing liabilities and (2) the value

23 of the assets securing the paper.  *Id.* ¶ 96.  The commercial paper at issue here was subject to

24 certain "triggers" tied to both criteria.  *Id.* ¶ 115.  If the commercial paper had too little liquidity

for rolling purposes or suffered major declines in the value of its asset portfolio, it would go into liquidation. *Id.*

The first two purchases at issue in this case were of commercial paper issued by a structured investment vehicle named "Mainsail II." FAC ¶ 89. Merrill Lynch became a dealer for Mainsail's commercial paper in April 2007. *Id.* ¶ 104. The vast majority of the assets in Mainsail's portfolio consisted of subprime mortgage-backed securities. *Id.* ¶ 100.

When Merrill Lynch became a dealer for Mainsail, it knew that Mainsail had been contaminated by the problems affecting the broader subprime mortgage market. Internal Merrill Lynch analyses of Mainsail revealed that Mainsail's subprime mortgage-backed securities were particularly prone to losses. FAC ¶ 105. One review of the AA-rated mortgage-backed securities held by Mainsail—equal to about half its asset portfolio—classified most as "awful," "bad," or "not horrible." *Id.* n.26.

Merrill Lynch was not just a dealer for Mainsail. Almost immediately after Merrill Lynch became a Mainsail dealer, Mainsail bought over $100 million of Merrill Lynch's subprime mortgage-backed securities. FAC ¶ 110. Mainsail paid Merrill Lynch 100 cents on the dollar for these assets despite their questionable value and the fact that similar sales of securities were typically discounted.[1] *Id.*

Throughout mid-2007, Merrill Lynch could see Mainsail's problems mounting. By the end of June, Merrill Lynch was the only securities broker willing to sell Mainsail commercial paper. FAC ¶ 117. By July, Merrill Lynch knew that Mainsail was close to hitting both its asset value and liquidity triggers. *Id.* ¶¶ 129, 135. Merrill Lynch knew the liquidity problems were particularly severe. Mainsail had recently lost its only source of loans to address short-term

---

[1] Mainsail's managers apparently agreed to this deal because they were paid for each transaction they conducted. FAC ¶ 81.

liquidity problems, jeopardizing its ability to roll commercial paper. *Id.* ¶ 129, n.52. The risk of default was so high that Merrill Lynch rejected a request from Mainsail to guarantee funds for short-term liquidity needs. *Id.* ¶¶ 133-34, n.53.

Although Merrill Lynch would not help Mainsail by guaranteeing the money it needed to pay its debts, it did participate in an emergency effort to keep Mainsail afloat. On July 16, Merrill Lynch helped Mainsail sell about $116 million in new debt, which in turn allowed Mainsail to buy new and somewhat better assets. FAC ¶ 136. Merrill Lynch knew, however, that this did not eliminate Mainsail's liquidity problem. *See id.* ¶ 140.

On the same day as the emergency effort to prop up Mainsail, a Merrill Lynch employee emailed King County's chief investment officer, describing Mainsail commercial paper as an "offering[] you might like." Dkt. # 70, Ex. 6. Merrill Lynch never disclosed, however, that Mainsail was staying afloat thanks to Merrill Lynch's help. *Id.* ¶ 148. Merrill Lynch also did not disclose that Mainsail still faced a major liquidity problem and that Merrill Lynch had refused to guarantee funds to meet Mainsail's liquidity needs. *Id.* Nor did it disclose that Mainsail's other dealers would no longer sell its commercial paper. *Id.*

King County eventually made two purchases of Mainsail at the end of July. FAC ¶¶ 177-78. In total, King County invested over $53 million in Mainsail commercial paper. *Id.* Less than a month later, Mainsail collapsed and went into liquidation. *Id.* ¶ 146. King County lost nearly three quarters of its investment. *Id.* ¶ 11.

## D. Merrill Lynch sells Victoria commercial paper to King County

The third purchase at issue in this lawsuit was of commercial paper issued by a structured investment vehicle named "Victoria." FAC ¶ 150. Victoria's asset portfolio was full of subprime mortgage-backed securities, albeit to a lesser degree than Mainsail's. *Id.* ¶¶ 154-55.

Merrill Lynch knew Victoria faced problems similar to those affecting Mainsail. By June 2007, Merrill Lynch knew Victoria was having trouble in the rolling process that allowed it to pay maturing debt. FAC ¶ 163. Merrill Lynch knew Victoria was especially exposed to the risk of hitting a liquidity trigger because it had large outstanding obligations relative to its available funds. *Id.*

Merrill Lynch aggressively tried to sell Victoria by offering lower and lower prices, but liquidity problems grew more acute throughout July 2007. FAC ¶ 164. By August 2, Merrill Lynch concluded that lowering the price was not enough and decided to market Victoria commercial paper with a put option. *Id.* ¶ 165. The put option would allow investors to buy Victoria commercial paper with a maturity date of 270 days but redeem it after 90 or 180 days. *Id.* This would make investment more attractive because buyers could get their money back if they sensed a risk of default before the maturity date. *Id.*

On August 2, after the put option was authorized but before it was announced, King County paid about $53 million for Victoria commercial paper. FAC ¶¶ 179. Merrill Lynch did not disclose its view of the degree of Victoria's liquidity problems. *Id.* ¶ 167. Nor did it disclose that it had decided to market Victoria commercial paper with a put option. *Id.*

Victoria defaulted in mid-January 2008, shortly before King County's purchase was set to mature. FAC ¶¶ 168-69. King County received some payment through a restructuring option but has still lost over half its investment. *Id.* ¶ 170.

### III. DISCUSSION

The FAC asserts seven causes of action against Merrill Lynch. One is for breach of contract, and the other six are for violations of the Washington State Securities Act ("WSSA").

FAC ¶¶ 185-239.  Merrill Lynch argues, pursuant to Federal Rule of Civil Procedure 12(b)(6), that each cause of action fails to state a claim upon which relief can be granted.  *See* Dkt. # 79.

## A.  Legal standard

In evaluating a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the light most favorable to the plaintiff. *Adams v. U.S. Forest Serv.*, 671 F.3d 1138, 1142-43 (9th Cir. 2012).  To survive a 12(b)(6) motion, a complaint must allege "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."  *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

## B.  Legal sufficiency of causes of action

### 1.  Breach of contract

King County's seventh cause of action is for breach of contract and turns on the Dealer Certification signed by its account executive, Raymond Thibodeau, in 1988.  King County alleges that Merrill Lynch materially breached its duties under the Dealer Certification by "fail[ing] to implement a system of controls that would preclude King County from investing in imprudent investments such as Mainsail and Victoria's commercial paper . . . and fail[ing] to disclose to King County all foreseeable risks concerning these investments."  FAC ¶ 238.

#### a.  Duty

Merrill Lynch argues the breach of contract cause of action lacks an essential element: a duty.  Merrill Lynch argues the Dealer Certification expressly applies only to the members of the sales team assigned to King County's account.  Dkt. # 79 at 6-7.  Defendant's position is that a

1 claim for breach of contract fails because King County has not alleged the sales team members

2 were aware of any undisclosed risks. *Id.* at 7.

3     This strikes the Court as an implausible spin on the Dealer Certification. As Merrill

4 Lynch sees it, King County made a contract with individual members of a sales team that had no

5 independent corporate existence. These individuals purported to bind the team's future

6 members, who were not legal successors in interest of the former. And these individuals did all

7 this by having their boss fill out an application for their employer to do business with the other

8 party.

9     Common sense and—more importantly—Washington's rules of contract interpretation

10 favor King County's reading. Under Washington law, "[t]he touchstone of contract

11 interpretation is the parties' intent." *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*,

12 128 Wash. 2d 656, 674 (Wash. 1996). Intent is determined by the objective manifestations of the

13 agreement. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 503 (Wash. 2005).

14     The inquiry begins and ends with the "ordinary, usual, and popular meaning" of

15 contractual language "unless the entirety of the agreement clearly demonstrates a contrary

16 intent." *Hearst Commc'ns*, 154 Wash. 2d at 504. Invoking the plain language rule, Merrill

17 Lynch focuses heavily on the Dealer Certification's use of the first person and reference to the

18 sales team:

19     **I** hereby certify that **I** have **personally read** the investment policies and
objectives of King County and have implemented reasonable procedures and a
20     system of controls designed to preclude imprudent investment activities arising
out of transactions conducted between our firm and King County. **All sales**
21     **personnel assigned to your account** will be routinely informed of your
investment objectives, horizon, outlook, strategies and risk constraints whenever
22     we are so advised. We will notify you immediately by telephone and in writing in
the event of a material adverse change in our financial condition. **We** pledge to
23     exercise due diligence in informing you of all foreseeable risks associated with

24

financial transactions conducted with our firm.  I attest to the accuracy of our responses to your questionnaire.

Dkt. # 79 at 7 (quoting Dkt. # 70, Ex. 1 at 5) (bold in motion to dismiss).

Merrill Lynch's attempt to conflate the first person with the sales team is too strained to be plausible.  *See Woo v. Fireman's Fund Ins. Co.*, 161 Wash. 2d 43, 76 (Wash. 2007).  If "we" and "our" refer to the sales team, the second sentence would require the sales team to be informed of King County's investment wishes whenever the sales team was so informed.  The third sentence would be equally odd: the sales team would have to notify King County of changes in its financial condition rather than Merrill Lynch's.

It is far more plausible to read "we" and "our" as referring to Merrill Lynch as a whole.  This is a common convention known as the "editorial we."  *See* The Chicago Manual of Style ¶ 5.51 (15th ed. 2003).  Applied here, it eliminates the implausible features of Merrill Lynch's reading.

One might argue that this reading creates an impermissible redundancy in the fourth sentence, which uses both "we" and "our firm."  Dkt. # 70, Ex. 1 at 5.  Contracts are read to avoid redundancies.  *See Navlet v. Port of Seattle*, 164 Wash. 2d 818, 842-43 (Wash. 2008).  But with the editorial we, it is standard practice to use both the pronoun and the name of institution it describes interchangeably in the same sentence.  Distinguished jurists do so.  *See, e.g.*, *Diaz v. Brewer*, 676 F.3d 823, 828 (9th Cir. 2012) (O'Scannlain, J., dissenting from denial of rehearing on en banc) ("If our court were going to break so dramatically from long-standing practice and tradition—and divide ourselves from the weight of authority on a matter that is so important— we should have done so only after reconsidering this matter en banc.").  So does the national media.  *See, e.g.*, Press Release, USA Today, USA Today Celebrates 25 Years As The Nation's Newspaper (Sept. 14, 2007) ("We are committed to moving forward with the same enthusiasm

and talent that have made this newspaper successful over the last two-and- a-half decades.")

Even prestigious financial services firms talk to their clients this way. *See Leveraging Our Strengths*, Merrill Lynch 2000 Annual Report,

http://www.ml.com/annualmeetingmaterials/annrep00/ar/leveraging.html (last visited June 18, 2012) ("By promoting a culture in which . . . ideas and expertise are shared across our firm, we create a more productive and satisfying experience for clients and employees alike.")

This does not dispose entirely of Merrill Lynch's argument. The first and last sentences of the Dealer Certification both use the first person singular. *See* Dkt. # 70, Ex. 1 at 5. Merrill Lynch views this as additional proof that Thibodeau spoke only for himself and his sales team. Dkt. # 79 at 7.

The Court disagrees. The use of "I" in the Dealer Certification is attached to references to "our firm" and "our answers," strongly suggesting that Thibodeau spoke in a representative capacity. Dkt. # 70, Ex. 1 at 5. And if there is any doubt, extrinsic evidence cuts in favor of King County's reading. The Court may turn to extrinsic evidence "to determine the meaning of specific words and terms used." *Hearst Commc'ns*, 154 Wash. 2d at 503 (quoting *Hollis v. Garwall*, 137 Wash. 2d 683, 696 (Wash. 1999)). Valid extrinsic evidence includes "the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." *Tanner-Electric*, 128 Wash. 2d at 674 (quoting *Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc.*, 120 Wash. 2d 573, 580-81 (Wash. 1993)).

Here, the most pertinent extrinsic evidence is the Dealer Questionnaire, of which the Dealer Certification is the final part. In the Dealer Questionnaire, Thibodeau explicitly identified

himself as a "representative" of Merrill Lynch. *Id.* The questions he answered focused heavily on Merrill Lynch's finances, experience, and policies. *See id.* at 1-3. He even used the term "we" in response to a question about "your firm." *Id.* at 3. In light of basic principles of agency law—which allowed Thibodeau to bind Merrill Lynch to contracts—the use of "I" indicates Thibodeau spoke on behalf of Merrill Lynch. *See King v. Riveland*, 125 Wash. 2d 500, 507 (Wash. 1994); Restatement (Third) of Agency § 6.01 (2006).

Merrill Lynch's remaining arguments for reading the Dealer Certification to apply solely to Thibodeau and his staff are unavailing. First, Merrill Lynch contends that the word "we" must be interpreted in light of its last antecedent. Dkt. # 92 at 3. This grammatical rule, Merrill Lynch claims, makes it arguable that "we" refers to the sales team, and the Court must resolve this ambiguity against the drafter of the Dealer Certification: King County. *Id.* This argument wrongly assumes that "we" is necessarily ambiguous here. As discussed above, King County's reading gives that pronoun its only sensible meaning.

Second, Merrill Lynch argues that any interpretation of the Dealer Certification other than its own is absurd. Merrill Lynch argues that King County's construction of the Dealer Certification would require Merrill Lynch to collect the knowledge of tens of thousands of employees working in 130 separate business entities. Dkt. # 79 at 8. Not so. The Dealer Certification required Merrill Lynch to "implement[] reasonable procedures and a system of controls designed to preclude imprudent investment activities" and to "exercise due diligence in informing [King County] of all foreseeable risks associated with financial transactions conducted" with Merrill Lynch. Dkt. #70, Ex. 1 at 5. It would not be absurd for Merrill Lynch to have procedures for moving institutional knowledge about its products to its salespeople and to train its salespeople to advise clients with different levels of tolerance for risk.

*b. Breach*

Merrill Lynch argues that even if the Dealer Certification imposed duties on Merrill Lynch as a whole, King County has not alleged a breach of those duties. Merrill Lynch argues it satisfied its contractual duties by giving King County prospectuses describing the composition of and risks associated with Mainsail and Victoria. Dkt. # 79 at 8.

The parties dispute heavily whether the Court may take judicial notice of these prospectuses. *See* Dkt. # 79, Attachment 3; Dkt. # 90. The Court need not decide that matter. Even if the Court took judicial notice of the prospectuses, it would still find that King County has stated a claim for breach of contract. The prospectuses discussed risks in general, hypothetical terms. *See* Dkt. # 79 at 9-12. But the Dealer Certification arguably requires more robust warnings. It envisions that Merrill Lynch would actively prevent investments it considered imprudent or at least warn King County when it considered risks likely to come to pass.

The Mainsail prospectus would not have alerted King County to the high degree of risk Merrill Lynch perceived with respect to Mainsail commercial paper, especially after the email describing Mainsail commercial paper as a purchase King County "might like." Dkt. # 70, Ex. 6. Merrill Lynch's internal review of Mainsail's asset portfolio was scathing. FAC n.26. By June 2007, Merrill Lynch was the only securities broker willing to work with Mainsail. *Id.* ¶ 117. Merrill Lynch appears to have become a Mainsail dealer as part of a quid pro quo arrangement: Merrill Lynch would help keep Mainsail afloat by selling its commercial paper, and Mainsail would act as a dumping ground for over $100 million in toxic subprime mortgage assets. *Id.* ¶ 110. Merrill Lynch thus simultaneously made Mainsail weaker and shifted the risk of subprime mortgage losses to investors. Merrill Lynch was so concerned about Mainsail that it refused to assist directly with Mainsail's liquidity problems, knowing that to do so would expose itself to the risk of default. *Id.* ¶¶ 133-34, n.53.

1   Although the circumstances surrounding Victoria are less damning, the Victoria

2   prospectus nonetheless would not have conveyed the likelihood of default that Merrill Lynch

3   perceived.  Merrill Lynch knew Victoria was having liquidity problems by June 2007 and that its

4   available liquidity was small relative to its outstanding debt.  FAC ¶¶ 163, 166.  Merrill Lynch

5   saw Victoria as so unstable that it decided to market a put option, which was clearly a stopgap

6   solution for major liquidity problems.  *Id.* ¶ 165.

7       2.  Untrue statements or omissions of material fact

8           King County's remaining causes of action concern alleged violations of Washington's

9   securities laws.  The first, second, and third causes of action arise under WSSA § 21.20.010(2),

10  which makes it "unlawful for any person, in connection with the offer, sale or purchase of any

11  security, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to

12  state a material fact necessary in order to make the statements made, in the light of the

13  circumstances under which they are made, not misleading."  Wash. Rev. Code § 21.20.010(2).

14      *a.  Victoria purchase*

15          The Court begins with King County's third cause of action, which concerns the

16  purchase of Victoria.  Merrill Lynch argues that the third cause of action fails to state a

17  § 21.20.010(2) claim because the FAC does not allege Merrill Lynch made a statement of fact in

18  connection with Victoria.  Dkt. #79 at 13-14.  The relevant allegations, Merrill Lynch argues,

19  merely show Merrill Lynch represented compliance with promises made in the 1988 Dealer

20  Certification.  *Id.* at 15.  Merrill Lynch argues King County cannot twist past contractual

21  promises into a statement of fact necessary to support a § 21.20.010(2) claim.  *Id.* at 15-16.

22          The Court implicitly rejected this logic when it denied Merrill Lynch's motion to dismiss

23  King County's first complaint.  The Court ruled that Merrill Lynch's silence in the face of

24

promises made in the Dealer Certification could constitute a breach of a duty to disclose and thus support a § 21.20.010(2) claim.  Dkt. # 42 at 8.

Upon further reflection and additional review of case law, the Court concludes its earlier reasoning was mistaken.  It agrees with Merrill Lynch that a § 21.20.010(2) claim cannot be based on a promissory statement and that the third cause of action fails for this reason.

Washington courts have not addressed whether a contractual promise is a statement for the purpose of § 21.20.010(2).  Federal securities law, however, offers persuasive guidance.  The WSSA is to be "so construed as to . . . coordinate [its] interpretation and administration" with federal securities laws.  Wash. Rev. Code § 21.20.900.  And courts universally agree that "contract breach is not a sufficient predicate for securities fraud" under § 21.20.010(2)'s federal counterpart, SEC Rule 10b-5(b).  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691-92 (9th Cir. 2011).  This logic flows from the nature of fraud itself.  "[A] claim of fraud must rest on an inaccurate assertion as to a matter of past or existing fact."  26 *Williston on Contracts* § 69:11 (4th ed. 2012).  A promise does not contain a false assertion of fact unless it is accompanied by a simultaneous intent not to perform.  *Id.*

This reasoning applies equally to § 21.20.010(2).  The WSSA's ban on material misstatements and omissions is worded identically to its Rule 10b-5 counterpart.  *Compare* Wash. Rev. Code § 21.20.010(2) *with* 17 C.F.R. § 240.10b-5(b).  Further, Washington courts recognize that comparable common law fraudulent misrepresentation claims require assertions of fact rather than promises of future performance.  *See West Coast, Inc. v. Snohomish Cnty.*, 112 Wash. App. 200, 206 (Wash. Ct. App. 2002).

Under this widely accepted principle, King County has not stated a § 21.20.010(2) claim regarding the Victoria purchase.  Every alleged statement is untrue only when viewed in light of

the promises made in the Dealer Certification. Three of the four alleged statements were representations by "conduct and/or implication" that the Victoria purchase was prudent. *See* FAC ¶ 205(b)-(d). To the extent these can be characterized as statements, they merely represented that Merrill Lynch had complied with its contractual duties. The other allegation contains independent factual content, but it was true: Victoria had high ratings from credit rating agencies. FAC ¶ 205(a). King County alleges this true statement was misleading because Merrill Lynch represented "by conduct and/or implication" that it had disclosed all information that might call those ratings into question. *Id.* Thus, as with the other statements, the alleged falsehood exists only through reference to earlier promises.

King County argues the above rule does not apply because it "was not deceived by the representations in the contract itself." Dkt. # 91 at 18. This argument is merely a semantic game. "I have complied with my earlier promises" derives its meaning from earlier promises. King County's strained effort to treat this as an independent assertion of fact falls apart in its own brief. In order to show the implied assertion of fact exists, King County argues Merrill Lynch's silence must be viewed in light of promises made in the Dealer Certification. *Id.* at 19. In other words, King County concedes that it relied on Merrill Lynch's earlier promise when buying the securities at issue.

King County also argues it has shown the necessary assertion of fact because "silence, in the face of a duty to disclose, constitutes a representation of the nonexistence of the matter not disclosed." Dkt. # 91 at 14. This duty of disclosure still leaves King County in need of a non-promissory statement. The duty to disclose to which King County refers comes from the Second Restatement of Torts. *See Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wash. 2d 107 (1988). Section 551 of the Second Restatement lays out a five-element test for this duty. One

element is that disclosure must be "necessary to prevent [the speaker's] partial or ambiguous statement of the facts from being misleading." Restatement (Second) of Torts § 551(2)(b) (1977). Each element in the § 551 test is conjunctive. *See id.* Thus, this duty to disclose demands that there be an assertion of fact in need of clarification. Every § 551 case King County cites confirms this proposition. *See* Dkt. # 91 at 21; *Haberman*, 109 Wash. 2d at 168 (duty to disclose arguably existed following misleading representation); *Guarino v. Interactive Objects, Inc.*, 122 Wash. App. 95, 129-30 (Wash. Ct. App. 2004) (duty to disclose exists to correct misleading representation of fact); *Favors v. Matzke*, 53 Wash. App. 789, 797-98 (Wash. Ct. App. 1989) (no duty to disclose where representations of fact were complete).

King County argues that the *Haberman* case created a broader duty to disclose that arises whenever a defendant "has knowledge necessary to prevent misrepresentation, or facts basic to the transaction where the plaintiff would reasonably expect disclosure." Dkt. # 91 at 20 n.63 (quoting *Haberman*, 109 Wash. 2d at 168). This argument mischaracterizes *Haberman* through selective quotation. In relevant part, *Haberman* held that common law fraudulent misrepresentation did not require privity or a fiduciary relationship. In line with § 533 of the Second Restatement, *Haberman* concluded that statements calculated to induce third-party reliance were a basis for a fraudulent misrepresentation claim. *See Haberman*, 109 Wash. 2d at 168; Restatement (Second) of Torts § 533. This confirms rather than contradicts that failure to disclose is fraud only if there was a prior assertion of fact.

In the end, King County identifies only one possible representation of fact independent of the Dealer Certification. Specifically, King County seems to argue that the mere act of selling of a security is an implied representation of creditworthiness. *See* Dkt. # 91 at 14-15. It cites for support a pair of decades-old federal circuit court cases interpreting § 12(2) of the federal 1933

Securities Act: *Alton Box Board Co. v. Goldman, Sachs & Co.*, 560 F.2d 916 (8th Cir. 1977), and *Franklin Savings Bank of N.Y. v. Levy*, 551 F.2d 521 (2d Cir. 1977).  Dkt. # 91 at 14-15.  A close examination of these cases shows that neither took the sweeping, implausible position that the mere act of selling a product can be the basis of a fraud claim.  In *Franklin*, the defendant did not dispute that it had made a representation about creditworthiness.  *See* 551 F.2d at 526.  Rather, the dispute centered on whether that representation was one of fact or opinion.  *See id.*  In *Alton*, the implied misrepresentation concerned a third-party agency's rating of a security as creditworthy.  But the plaintiff had alleged in his complaint that the agency's rating was itself based on misrepresentations provided by the defendant broker.  *See* 560 F.2d at 919.  This allegation was consistent with a tort claim for a misleading statement made with the expectation of third-party reliance.  *See* Restatement (Second) of Torts § 533.

Further, even if King County's reading of *Alton* and *Franklin* is correct, the Court would not adopt it.  Both cases concerned § 12(2) of the 1933 Securities Act.  Rule 10b-5, by contrast, is an implementation of the 1934 Securities Exchange Act.  Rule 10b-5 requires intent to defraud.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).  Section 12(2) is broader: it applies to negligent omissions, and *Franklin* explicitly disclaimed any applicability to Rule 10b-5 on that ground.  *See Franklin*, 551 F.2d at 526.  King County points to several Washington cases adopting features of § 12(2) doctrine for the WSSA.  *See* Dkt. # 91 at 14 n.43.  But it would go too far to read a pair of decades-old § 12(2) cases as equating sales with statements for the purpose of a fraud claim.  To do so would give § 21.20.010(2) a meaning completely at odds with its federal counterpart.  *See Matrixx Initiatives, Inc. v. Siracusano*, --- U.S. ---, 131 S. Ct. 1309, 1321 (2011) ("Rule 10b–5(b) do[es] not create an affirmative duty to disclose any and all material information.")

### b. *Mainsail purchases*

King County's first and second causes of action apply to Mainsail. They allege the same statements found insufficient with respect to Victoria plus one more. The additional allegation is that Merrill Lynch recommended Mainsail commercial paper as an offering King County "might like." FAC ¶¶ 187(a), 196(a). The additional allegation is insufficient for the same reason as the others: it is meaningful only with respect to the promises made in the Dealer Certification. King County alleges the email was misleading because "by implication [it] represented that Mainsail commercial paper fit King County's conservative, risk-averse investment objectives and guidelines." FAC ¶¶ 187(a), 196(a). Thus, by its terms, the alleged representation is of compliance with earlier promises. King County even concedes this: it argues the email must be "viewed in the context of the long-standing relationship between the parties and the Dealer Certification's role as a 'standing request for disclosures of material risks.'" Dkt. # 91 at 15 (quoting FAC ¶ 32).

### 3. Act, practice, or course of business operating as a fraud or deceit

King County's fourth and fifth causes of action arise under WSSA § 21.20.010(3). Section 21.20.010(3) makes it unlawful "in connection with the offer, sale or purchase of any security . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Wash. Rev. Code § 21.20.010(3). The fourth cause of action alleges Merrill Lynch engaged in deceitful practices by selling Mainsail and Victoria commercial paper despite knowing of the risks associated with similar products and while trying to limit its own exposure to such risks. FAC ¶ 215. The fifth cause of action centers on Merrill Lynch's using Mainsail as a dumping ground for toxic subprime assets and selling it by touting its misleadingly high credit ratings. *Id.* ¶ 222.

*a. Victoria purchase*

Merrill Lynch argues that to the extent the fourth cause of action applies to Victoria, it does not meet Federal Rule of Civil Procedure 9(b)'s requirement that a complaint alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); Dkt. # 79 at 23. As King County notes, the Court has already rejected the same argument. Dkt. # 91 at 23. Earlier, the Court ruled that WSSA claims are not fraud claims for the purposes of Rule 9(b) because the WSSA does not require proof of scienter, which is a traditional element of fraud claims. Dkt. # 42 at 3-4; *Kittilson v. Ford*, 93 Wash. 2d 223 (Wash. 1980).

The Court now concludes it was mistaken. Under Ninth Circuit precedent, Rule 9(b) requires particularity where fraud is not an essential element of a claim but the challenged claim "sound[s] in fraud." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). This rule applies to state law causes of action that encompass fraudulent and non-fraudulent conduct. *See id.*

Although not conceding that the Court was mistaken earlier, King County argues that the particularity requirement does not apply because its allegations regarding Victoria do not sound in fraud. Dkt. # 91 at 23. The Court finds this "nominal effort[]" to disclaim fraud as the basis of the fourth cause of action unconvincing. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996). The fourth cause of action alleges that

> Merrill engaged in deceitful acts and practices in connection with [its] offer and sale of . . . Victoria . . . . By mid-July 2007, Merrill was well aware of the serious risks surrounding virtually all structured finance products, including but not limited to those with any significant exposure to the residential mortgage market. Merrill was doing all it could internally to reduce its own exposure to these risks. Yet at the same time it continued to market and sell products exposed to these risks to unsuspecting parties like King County.

FAC ¶ 215.

1    King County also alleges that it would not have bought Victoria but for these deceitful

2    practices.  FAC ¶ 216.  Taken together, these allegations present a claim that "sound[s] in fraud."

3    *Vess*, 317 F.3d at 1103.  "Fraud can be averred . . . by alleging facts that necessarily constitute

4    fraud (even if the word 'fraud' is not used)."  *Id.* at 1105.  The alleged facts show all of the

5    textbook elements of fraud.  *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice*

6    *and Procedure* § 1297 (3d ed. 2004) ("all or almost all jurisdictions" view fraud as requiring

7    falsehood or misleading omission, scienter, victim's belief in accuracy of representations, intent

8    to deceive, and detrimental reliance).

9    The question, therefore, is whether the allegations concerning Victoria are particular

10   enough to support a § 21.20.010(3) claim.  They are not.  Averments of fraud must describe

11   circumstances "specific enough to give defendants notice of the particular misconduct . . . so that

12   they can defend against the charge and not just deny that they have done anything wrong."  *Vess*,

13   317 F.3d at 1106 (citation and internal quotation marks omitted).  The factual allegations show

14   Merrill Lynch sold Victoria with the knowledge it was a bad product.  But the FAC does not

15   allege specific conduct tending to show a deceitful scheme.  Quite the contrary.  Merrill Lynch

16   signaled to investors that Victoria was not a good product by cutting its price aggressively.  FAC

17   ¶ 164.  This behavior merely indicates Merrill Lynch followed the law of supply and demand.

18   *b.  Mainsail purchases*

19   King County's fifth cause of action and the remainder of the fourth cause of action allege

20   Merrill Lynch sold Mainsail despite knowing its risks and while using Mainsail to offload toxic

21   assets on to investors like King County.[2]  FAC ¶¶ 215, 222.  Merrill Lynch argues these claims

22   fail because the Mainsail prospectuses adequately described all material risks.  Dkt. # 79 at 24.

23

24   [2] The Court notes that with the Victoria claim dismissed, these causes of action seem virtually identical.  Merrill
     Lynch does not argue they are redundant, and the Court expresses no opinion on that question.

As noted above, the parties dispute whether the prospectuses are subject to judicial notice. *See* Dkt. # 79, Attachment 3; Dkt. # 90. And as before, the Court need not address the question because the prospectuses would not resolve the issue. The prospectuses discussed Mainsail's risks in generic, hypothetical terms. *See* Dkt. # 79 at 9-12. King County alleges not only that Merrill Lynch sold Mainsail while expecting it to collapse but that it used Mainsail as a vehicle to dump toxic subprime assets on investors. FAC ¶¶ 110, 117, 129, 133-34; nn. 26, 53.

### 4. Control person liability

King County's sixth cause of action is the last WSSA claim and the easiest to address. It alleges control person liability under WSSA § 21.20.430(3). King County alleges several of the entities making up Merrill Lynch controlled other entities directly responsible for the alleged WSSA violations. As a result, the entities are jointly and severally liable pursuant to § 21.20.430(3). FAC ¶¶ 228-32.

Merrill Lynch challenges this cause of action solely on the ground that there is no underlying WSSA violation. Dkt. # 79 at 24. This argument fails. As discussed above, King County's § 21.20.010(3) causes of action survive in whole or in part.

## IV. CONCLUSION

Having reviewed the FAC, the exhibits attached thereto, Defendants' request for judicial notice, and the relevant briefs, the Court hereby ORDERS:

(1)     Defendants' motion to dismiss the FAC (Dkt. # 79) is:

       a. GRANTED with respect to Plaintiff's first, second, and third causes of action;

       b. GRANTED with respect to Plaintiff's fourth cause of action to the extent it concerns the purchase of Victoria and DENIED to the extent it concerns the purchase of Mainsail;

c. DENIED with respect to Plaintiff's fifth cause of action

d. DENIED with respect to Plaintiff's sixth cause of action; and

e. DENIED with respect to Plaintiff's seventh cause of action.

(2) The parties' requests for oral argument are DENIED as moot.

(3) The Clerk is directed to forward a copy of this Order to all counsel of record.

Dated this 25 day of June 2012

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE